David LAW, et al., Respondent,

v.

ESSICK MANUFACTURING COMPANY, Appellant,

Liberty Mutual Insurance Company, intervenor, Respondent.

No. C6–86–405.

Court of Appeals of Minnesota.

Dec. 2, 1986.
Review Denied Jan. 27, 1987.

---

John H. Faricy, Jr., Pustorino, Pederson, Tilton & Farrington, Minneapolis, for David Law, et al.

Eric J. Magnuson, Richard J. Nygaard, Jeremiah P. Gallivan, Rider, Bennett, Egan

& Arundel, Minneapolis, for Essick Mfg. Co.

Michael S. Kreidler, Lasley, Gaughan, Stich & Angell, Minneapolis, for Liberty Mutual Ins. Co., intervenor.

Heard, considered and decided by POPOVICH, C.J., and LANSING and CRIPPEN, JJ.

## OPINION

CRIPPEN, Judge.

In this products liability case, appellant Essick/Hadco Manufacturing Co. (Essick) alleges error in the admission of expert testimony and the inclusion of certain jury instructions. We affirm.

## FACTS

Respondent David Law regularly used an Essick Model 1000D cement mixer in his construction job. In January 1980, while operating the mixer, Law slipped on loose sand underneath his feet. He reached with his arm to break his fall, but his hand went through the grille covering the opening of the mixer and into the mixing paddles below. His hand became jammed in the paddles, causing permanent disability to his hand and an eventual amputation of two fingers.

David and Marcia Law sued appellant Essick, the mixer's manufacturer, alleging the mixer's grille was in a defective condition unreasonably dangerous because of its design. Respondents claimed appellant breached its duty of reasonable care by failing to equip the mixer with a grille that has smaller spaces between the bars, and this breach of duty caused David Law's injuries.

The Model 1000D mixer that Law was using at the time of his injury was manufactured in 1969. The spaces between the bars on the grille measured 4.25 × 17.25 inches.

Sometime after 1969 and until 1981, Essick engineers experimented with 2 × 2 inch grilles (standard until 1974) and then 3 × 3 inch grilles (standard between 1974 and 1981). Essick used the 2 × 2 inch and 3 × 3 inch grilles to prevent inadvertent contact by machine operators with the mixer paddles. However, both grilles were ultimately rejected because the small openings created other operating problems. The cement would quickly accumulate on the grille, clogging it and creating a need to remove and clean the grille so frequently that users were removing the grille altogether rather than taking the time to give it the proper cleaning care.

In addition, Essick manufactured an optional 4.75 × 4.625 inch grille for mixers sold in New York, where a state law required cement mixers sold for use in that state to have grilles with openings at least that small. The optional grille was listed in the Essick parts manual as the "safety guard kit." With the adoption of the 3 × 3 inch grille in 1974, Essick ceased production of the optional "New York" grille.

In 1981, appellant adopted a standard 4 × 4 inch grille, which is still in use today. Essick also made available a $40 kit to permit attachment of the new grille to the machines manufactured before 1981.

Evidence on the issue of whether the 4.25 × 17.25 inch grille was unreasonably dangerous because of its design was introduced through two expert witnesses, Darrell Vincent for appellant and John Carroll for respondents. Vincent, who has a degree in mechanical engineering, has been Essick's chief engineer since 1960. Carroll, a consulting engineer with a civil engineering education, specializes in accident reconstruction. He frequently works for attorneys in personal injury and products liability cases. He has investigated accidents involving machine guards for the past 19 years.

Both experts agreed on the facts underlying their separate opinions. They agreed that Law was using the mixer as it was intended to be used. Both agreed that cement mixers are frequently used in areas of treacherous footing. Both agreed that one purpose of grilles on cement mixers is to prevent inadvertent contact between

someone's hand or arm and the mixing paddles. They agreed that grilles with smaller openings are preferable for safety, but that the protective purpose must be balanced against the need for a grille that will not be constantly clogged with cement. Both were aware of the American National Standard Institute (ANSI) specifications requiring the guarding of moving parts from inadvertent contact with a person's body and of the absence of any Occupational Safety and Health Administration (OSHA) standards on cement mixer guards.

Despite their agreement on these underlying facts, the expert witnesses differed on whether the grille on the 1969 Model 1000D mixer was unreasonably dangerous due to defective design. Vincent testified that the $4.25 \times 17.25$ inch grille on the 1969 mixer was not "overly dangerous or defective" and that it was fit for its intended purpose. He based his opinion on "thousands and hundreds of thousands of man hours" with the product. He also testified that a person's hand, at least in a closed position, could go through both the New York grille and the $4 \times 4$ inch grille presently in use. Law's hand was in an outstretched, open position when it went through the grille.

Carroll testified to the contrary that the grille on the 1969 mixer was in a defective condition that was unreasonably dangerous. He testified that either the $4 \times 4$ inch grille or the New York grille would have prevented the accident. He formulated his opinion in reliance on ANSI specifications, the depositions and trial testimony, measurements and pictures of the mixer, grille, and Law's hand, and a scale model of the mixer. He also relied on his training as a civil engineer, his twenty-four years of experience in the construction industry (including use of cement mixers), and his work for the past nineteen years investigating accidents (including guarding accidents). Carroll testified that he applied his expertise to the specific facts of the accident in reaching his opinion.

Appellant objected to the admission of Carroll's testimony, alleging lack of qualification, lack of foundation, and that Carroll's expert opinion was improperly based on hindsight. Appellant renewed this objection in its motion for a new trial and raises it once again on appeal.

The jury returned a special verdict finding that the mixer was in a defective condition unreasonably dangerous because of its design, and that the defective condition was a direct cause of David Law's injuries. The jury also found that Law failed to exercise reasonable care for his own safety and that his failure was a direct cause of his injuries. The jury apportioned 82.5% of the cause to Essick and 17.5% to Law, and found that $230,000 would fairly compensate Law for his injuries. Marcia Law was awarded $10,000.

In its post-trial motions for JNOV or a new trial, appellant objected to a jury instruction on the manufacturer's duty to install safety devices and to not delegate the duty to others. Appellant did not object to this instruction at trial. The trial court denied all post-trial motions; Essick appeals.

## ISSUES

1. Was it reversible error to admit the testimony of respondents' expert witness?

2. Did the jury instructions contain a fundamental error of law that was prejudicial to appellant, requiring a new trial?

## ANALYSIS

Before reviewing appellant's specific arguments, we first recognize its view that this case illustrates the current public policy controversy over whether products liability litigation and verdicts are "out of control." Appellant argues that the failure to exclude the expert testimony of witnesses who earn significant income from testifying in such cases encourages frivolous suits, unfairly forces manufacturers out of business, and pushes to the limit society's ability to bear the cost of rising insurance and litigation costs. Under the issues and evidence presented here, however, and giv-

en the limited scope of review, the argument is unconvincing.

## I.

The admissibility of expert testimony rests squarely within the trial court's discretion, and its ruling will not be reversed on appeal absent a showing of an abuse of discretion. *Reinhardt v. Colton,* 337 N.W.2d 88, 92 n. 1 (Minn.1983). In making its determination, the trial court must consider whether the expert was shown to be competent to render an opinion on the matter in question and whether the opinion was based on facts sufficient to form an adequate foundation. Minn.R.Evid. 702, 703; *Hudson v. Snyder Body, Inc.,* 326 N.W.2d 149, 155 (Minn.1982).

Appellant first attacks Carroll's qualifications as an expert on the design of guards for power cement mixers. Essick asserts that only a mechanical engineer would be competent to give an opinion on the adequacy of the machine's design, as mechanical engineering specifically encompasses the study of machine design, but civil engineering does not. Appellant also claims Carroll is not competent because he had no experience investigating cement mixer accidents.

■ The Minnesota Rules of Evidence do not require that an expert be formally trained in an area in order to offer an expert opinion on the topic. "[A] witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise". Minn.R.Evid. 702. Carroll's work prior to entering college provided him with sixteen years of practical experience in nearly every aspect of the construction industry, including cement masonry and finishing. He continued working in construction for four years after graduating from college and then turned to construction design and engineering. While working in that field he was introduced to forensic engineering, which primarily involves the reconstruction of accidents.

During the next four years Carroll spent increasing amounts of time in forensic engineering work before leaving his job to devote himself fulltime to the specialty. He served a two-year internship developing the necessary skills and has been working as a consulting forensic engineer for the past fifteen years. In addition, Carroll testified that he had personally used cement mixers similar to the one involved here and that his years of investigative work have frequently involved guarding accidents.

Given these qualifications, the trial court did not abuse its discretion in refusing to exclude Carroll's testimony on the basis of incompetency. This is especially true given the limited and easily defined issue addressed by both expert witnesses of whether the spaces between the bars on the Model 1000D grille were so large that they created an unreasonable danger that could have been prevented by a safer design.

Appellant also challenges Carroll's testimony on foundation grounds, alleging Carroll improperly formulated his opinion without ever having seen the cement mixer. Respondents acknowledge that Carroll had not seen the cement mixer at the time he first expressed his opinion in his deposition and that he later expressed substantially the same opinion at trial.

■ However, respondents point out that Carroll did examine a scale model of the mixer before trial. Carroll testified that his inspection of the model reaffirmed his initial conclusions. Moreover, Carroll initially formulated his opinion in reliance on his own experience, Law's deposition, Vincent's deposition, and measurements and pictures of the mixer, the grille, and Law's hand. It is doubtful that an examination of the mixer was critical to the simple fact in issue. *See Wohlfeil v. Murray Machinery, Inc.,* 344 N.W.2d 869, 875 (Minn.Ct.App.1984) (it is not necessary that "an expert observe how a person was injured or operate the machine that allegedly caused the accident").

Appellant further argues that Carroll's testimony lacked foundation because he believed the mixing paddles inside the machine rotated in the opposite direction than

they actually do. This argument is misguided: Carroll did not testify about the cement mixer's mechanics but only about the adequacy of the grille's design. Carroll's misconception about the mixer's interior mechanics raises questions about the overall probative force of his testimony but does not affect its admissibility.

Appellant would also have us disregard Carroll's opinion on the grounds that it constitutes a legal conclusion based on hindsight and not a factual opinion on whether the guard was inherently unreasonably dangerous. This objection also goes only to the weight of Carroll's testimony and not to its admissibility. Carroll testified that anyone operating the mixer would run an unreasonable risk of injury, not that the guard was dangerous because Law had been injured by operating it. Both experts agreed that a balancing between the need for safety and the impact of practical and economic factors is critical to the evaluation of the guard's design; Carroll concluded that the safety need outweighed the practicality concerns.

 Finally, appellant has failed to show that respondent's expert testimony, even if erroneously admitted, was prejudicial. *See* Minn.R.Civ.P. 61 (no error is ground for granting a new trial unless refusal to do so is inconsistent with substantial justice). Trial courts have broad discretion in deciding whether a new trial is required, and a decision to deny a motion for a new trial will not be reversed unless there was a clear abuse of discretion. *Westbrook State Bank v. Johnson,* 358 N.W.2d 422, 425–26 (Minn.Ct.App.1984) (citing *Connolly v. Nicollet Hotel,* 258 Minn. 405, 407, 104 N.W.2d 721, 724 (Minn.1960)).

Here, the jury heard other evidence sufficient to support the verdict. For example, Essick's development and manufacture of grilles with smaller openings is evidence that appellant recognized the need for a safer grille and discovered the feasibility of some safer designs. The jury heard Law's description of the accident and saw photos of the mixer and the grille as well as a scale model of the machine. Vincent and Carroll agreed on the need for protective grilles and for balancing efficiency and economy concerns against that need. The jury also heard Law's employer testify that Essick did not tell him to replace the outdated grille with the 4 × 4 inch grille. The trial court could not justify a new trial if the evidence apart from Carroll's testimony was sufficient to uphold the jury's verdict.

## II.

Appellant objects to the following portion of the trial court's jury instructions:

A manufacturer's obligation to design a safe product cannot be delegated to others under the assumption that they will install necessary safety devices on the product. The duty to install the device is on the manufacturer.

Appellant claims this jury instruction, "without further clarification," left the jury "with the erroneous impression that the manufacturer had an absolute obligation to install safety devices on the product without regard to cost or effect of the safety device on the performance of the product." Focusing on the evidence that Essick's attempts to market "safe" grilles with small openings failed because of clogging and cleaning problems and the ultimate removal of the grilles by many of its purchasers, appellant argues that the jury instruction removed from the jury's consideration a balancing test, the manufacturer's duty to balance safety against cost and feasibility.

Respondents counter that the jury heard a complete set of jury instructions incorporating the principles discussed in the leading products liability case. *See Bilotta v. Kelley Company, Inc.,* 346 N.W.2d 616 (Minn.1984). These instructions include the balancing test instruction to which appellant refers. The trial court first read both the balancing test instruction and the instruction on the manufacturer's duty to install safety devices. The court then repeated the balancing test instruction but did not repeat the second instruction. Later, after the jury asked for a repeat of some of the instructions, the court reread

both the balancing test and the manufacturer's duty to install safety device instructions.

■ Because appellant first raised its objection to the jury instructions in its motion for a new trial, our review is limited to errors in fundamental law or controlling principle. Minn.R.Civ.P. 51; *Gryc v. Dayton-Hudson Corp.*, 297 N.W.2d 727, 738–39 (Minn.1980), *cert. denied,* 449 U.S. 921, 101 S.Ct. 320, 66 L.Ed.2d 149 (1980). An error in jury instructions is fundamental only where the challenged language "destroys the substantial correctness of the charge as a whole, causes a miscarriage of justice, or results in substantial prejudice on an issue vital in the litigation." *Pomije v. Scheiber,* 371 N.W.2d 596, 601 (Minn.Ct.App.1985) (citing *Clifford v. Peterson,* 276 Minn. 142, 145, 149 N.W.2d 75, 77 (1967)).

■ The inclusion of the instruction on the manufacturer's duty to install safety devices did not destroy the substantial correctness of the charge. It neither caused a miscarriage of justice nor resulted in substantial prejudice. This is particularly true because the trial court emphasized the accompanying balancing test instruction by reading it a second time and by telling the jury that he repeated it with the specific intent of helping the jury members remember it a "bit more precisely." The court gave no such additional emphasis to the instruction to which appellant objects.

■ Moreover, a claim that an error is fundamental should not be sustained if the error is of a type that the objecting party should reasonably have been able to discern and raise before the jury retired. *Palatine National Bank of Palatine Illinois v. Olson,* 366 N.W.2d 726, 731 (Minn.Ct. App.1985) (citing 2 J. Hetland & O. Adamson, *Minnesota Practice* 366 (1970)). Appellant did not request an instruction addressing its concern, nor did it object to the omission of such an instruction. Indeed, appellant concedes that the jury instructions were technically correct. If there was error, it was not fundamental.

**DECISION**

The trial court properly admitted respondents' expert testimony. The jury instructions did not contain any fundamental error.

Affirmed.